## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| ELIZABETH DIONICIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRAD ALLISON, Special Agent of the | ) | NO. 3:09-cv-00575 |
| Tennessee Alcohol & Beverage | ) | JUDGE HAYNES |
| Commission, DANIELLE ELKS, Director | ) | |
| of the Tennessee Alcohol & Beverage | ) | |
| Commission, and MARK HUTCHENS, | ) | |
| Chief Enforcement Officer of the Tennessee | ) | |
| Alcohol & Beverage Commission, all in | ) | |
| their individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## M E M O R A N D U M

Plaintiff, Elizabeth Dionicio, filed this action under 42 U.S.C. § 1983 against the

Defendants: Brad Allison, Danielle Elks, and Mark Hutchens, individually and in their official

capacities as officers and employees of the Tennessee Alcohol and Beverage Commission

("TABC"). Plaintiff asserts claims under the Fourth and Fourteenth Amendments arising out of

the Defendant Allison's deception that led to her arrest by United States Immigration and

Customs Enforcement ("ICE") agents. In essence, Plaintiff asserts that Defendant Allison

deceived her with a promise of a TABC server's permit to enable ICE agents to question and

then arrest her, and this deception rendered her seizure a violation of the Fourth Amendment.

Plaintiff's Fourteenth Amendment claim is that Plaintiff's seizure arose out of the Defendants'

selective enforcement actions against her and other Hispanic applicants for TABC servers'

licenses, in violation of her rights under the Equal Protection Clause. Plaintiff also asserts that

the individual defendants formed a conspiracy to violate her rights that is actionable under 42

1

U.S.C. § 1985. Plaintiff's additional claims are that Defendants Elks and Hutchens failed to train and supervise Defendant Allison properly, and Allison was improperly enforcing federal immigration laws in violation of 8 U.S.C. § 1357(g). Finally, Plaintiff asserts claims that the Defendants violated the Privacy Act of 1974, 5 U.S.C. § 552a(g), by illegally requiring her to disclose the equivalent of a Social Security number and by disclosing the contents of her license application to ICE agents. The parties have completed discovery.

Before the Court is Plaintiff's motion for summary judgment on her Fourth Amendment and Fourteenth Amendment claims (Docket Entry No. 32) and the Defendants' motion for summary judgment as to all claims, (Docket Entry No. 31), that is not supported by any evidentiary materials.

In her motion, Plaintiff argues that the undisputed facts are that she was deceived into remaining at the TABC office and such deception renders her seizure by ICE agents illegal as a matter of law. Plaintiff further argues that the undisputed facts reveal the individual Defendants exhibited racial animus and discriminatory actions against Hispanic applicants for TABC's alcohol server permits. In their motion, Defendants contend that they did not seize Plaintiff and that claim fails as a matter of law; that Plaintiff lacks any evidence of their discriminatory intent required for her equal protection claim; and that Plaintiff's other claims depend on her constitutional claims and also fail as a matter of law.

For the reasons set forth below, the Court concludes that the Plaintiff's motion for summary judgment should be denied and Plaintiff's Fourth Amendment claim should be dismissed. The Defendants' motion for summary judgment should be granted in part and denied in part. Plaintiff has failed to provide evidence to support any claim against Defendants Elks and Hutchens. Plaintiff's training and privacy claims fail as a matter of law and fact. Plaintiff,

2

however, has raised a genuine issue of material fact as to whether Defendant Allison was motivated by a racially discriminatory intent.

## A. Review of the Record[1]

### 1. TABC Regulation of Alcohol Servers

Elks is TABC's director, Hutchens is TABC's chief enforcement officer and Allison is a TABC special agent. (Docket Entry No. 69, Defendants' Response to Plaintiff's Statement of Undisputed Facts at ¶ 18). Among its duties, TABC licenses servers of alcohol in Tennessee establishments and servers must apply for a TABC permit for such work, id. at ¶ 2, but a person can actually work as alcohol server for 61 days without a TABC permit. Id. at ¶ 1. TABC's server application requests the applicant's "S.S. #," i.e. Social Security number ("SSN"), and also requests the State that issued the SSN. Id. at ¶ 3. TABC's SSN request on the server permit form has been in effect some time prior to 1980. (Docket Entry No. 53, Elks Deposition at 76). Yet, without a SSN on the server application, an application for a server's permit could be granted if the applicant had a driver's license. (Docket Entry No. 53, Elks Deposition at 72-74).

Defendants concede that neither state law nor any TABC regulation requires an alcohol server to have a SSN to obtain a server's permit, (Docket Entry No. 69, Defendants Response to Plaintiff's Statement of Undisputed Facts at ¶¶ 5, 6) and further that neither state laws nor TABC regulations authorize Defendants to require a SSN. Id. at ¶ 7. Defendant Elks acknowledges that

---

[1] Upon a motion for judgment, the summary factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Although the facts of this action are largely undisputed, the parties' differ in their characterization of the events. Material factual differences, however, remain about Defendant Allison's motivations creating material factual disputes. Thus, this section does not constitute findings of fact under Fed. R. Civ. P. 56(d) except as to Plaintiff's claims against Defendants Elks and Hutchens.

3

other governmental documents may establish a person's identity such as the United States in foreign passports, a legal permanent resident and or employee authorization. (Docket Entry No. 53, Elks Deposition at 64). To understand Plaintiff's claims, additional factual background is necessary.

## 2. The 2003-04 Investigation

In 2003, TABC commenced an investigation of server applications for fake SSNs or failure to list a SSN. (Docket Entry No. 67-1, Plaintiff's Response to Defendants' Statement of Undisputed Facts at ¶ 4). TABC's 2003 investigation focused on Veronica Torres, one of several trainers TABC licensed to provide the necessary training for an alcohol server permit. Id. Torres' classes focus on Spanish-speaking workers and Torres conducts her classes in Spanish. TABC suspected Torres was telling her students that they could give fake SSNs on their server permit applications if they did not have a valid SSN. Id. at ¶¶ 9-10. For the 2003 investigation that extended into 2004, Elks instructed Mike Cawthon, TABC's special agent in charge "to inspect all licensed premises" at the time of their license renewal and secure the SSNs "of all the employees." (Docket Entry No. 53, Elks Deposition at 21-22).

To verify the SSNs on server applications, TABC attempted to match an applicant's or server's SSN with the SSNs from the state of issuance and Westlaw's SSN database. (Docket Entry No. 69 at ¶ 8; Docket Entry No. 57, Cawthon Deposition at 29-33). Cawthon requested "a list of all of the employees" for establishments and their permits for review at the time of renewal inspections. Cawthon described the results of this investigation that revealed "primarily Hispanic problems where the Social Security were where we would find them. We weren't finding them with other personnel in the industry." (Docket Entry No. 57, Cawthorn Deposition at 39). TABC, however, did not initiate any administrative enforcement action nor refer its

4

investigative finding to state or federal officials. As to TABC's lack of any enforcement response, Cawthorn's explanation was: "We don't have the authority to revoke." Id. at 40.

### 3. TABC's 2007-08 Investigation

In 2007, TABC commenced another investigation into server permit holders who provided false SSNs and focused again on Veronica Torres, led by Allison. (Docket Entry No. 67-1 at ¶ 5, citing Allison deposition and affidavit). According to Allison, Cawthon, his immediate supervisor, instructed him to investigate false SSNs on alcohol servers' permit applications. (Docket Entry No. 34, Allison Deposition at 51-52). In his internal report, Allison refers to investigation of Torres as "initiated" on "March 31, 2008," (Docket Entry No. 67-2 at 69), but in his deposition, Allison explained that his criminal investigation of Torres began on April 2, 2008. (Docket Entry No. 34 at 74). In any event, in 2007 Defendant Allison's investigation utilized undercover agents at Torres' server training classes. (Docket Entry No. 67-1 at ¶ 5 and p. 16, Response No. 5). These agents reported that Torres was suborning perjury by telling her students to provide false SSNs. Id. at ¶ 10. Allison did not investigate any other TABC licensed trainers.

TABC agents again began inspecting all servers' permits during monthly visits to restaurants and recording the names and permit numbers of the servers to check their records later for possibly fraudulent SSNs. Id. at ¶ 6. These monthly inspections occurred during the renewal inspections for a restaurant's license to serve alcohol that is set to expire. (Docket Entry No. 34, Allison Deposition at 125-126). TABC then attempted to verify the SSNs on file for the permit holders using the same method as they used for new applications, by first checking the number against the state of issue and then checking the Westlaw database. (Docket Entry No. 69 at ¶ 8).

5

These searches purportedly identified some 400 questionable or false SSNs, and approximately 90% of these questionable SSNs were given by servers whom Veronica Torres trained. (Docket Entry No. 67-1 at ¶ 8). About 190 of the approximately 240 Torres trainees on the list gave SSNs that did not match their names in the Westlaw database. Plaintiff notes that Defendants' records reflect that more than 100 of the allegedly questionable permits, actually listed names and SSNs that either matched the database or possibly matched. Id. at 19, Response to No. 8. From the Court's review of these records, all or virtually all (99%) of the servers Allison listed have Hispanic surnames, (Docket Entry No. 67-2 at 3-32) and worked at restaurants with Mexican or Spanish names. Id. Only four of the named restaurants from across the State had non-Hispanic names. Id. at 22, 54.

As with the earlier investigation, Allison's use of the Westlaw database to verify SSNs violated TABC's agreement with Westlaw:

> Use of such databases [Westlaw Public Record Databases] containing information on individuals in connection with transactions involving a consumer as defined by the Fair Credit Reporting Act, 15 U.S.C.A. § 1681 et seq. is prohibited. . . .Such prohibited uses include but are not limited to . . . (ii) determination of the consumer's eligibility for employment, . . . (iv) determination of the consumer's eligibility for any governmental license or benefit . . . .

(Docket Entry No. 32-1, Exhibit F at 32) (emphasis added).

In addition, use of Westlaw for verification has been cited as having high rates of inaccuracies:

> The 2007 Westat evaluation conducted for DHS found that the accuracy of the USCIS database has improved substantially. However, the error percentage was still too high for it to become a mandated program. The report finds that "the database used for verification is still not sufficiently up to date to meet the IIRIRA requirement for accurate verification." SSA estimated that 4.1 percent, or 17.8 million records, contained discrepancies related to name, date of birth or citizenship status; 12.7 million of these pertained to U.S. citizens. On average, 96 percent of employees attesting to be U.S. citizens were automatically confirmed

6

as authorized to work; compared to 72 percent of lawful permanent residents and 63 percent of immigrants authorized to work.

(Docket Entry No. 32-1, Exhibit G at 34).

In May 2008, based upon his prior discussions with unidentified attorneys in the District Attorney General's office, Allison decided not to pursue state criminal charges against Torres for suborning perjury or against those who submitted false SSNs for perjury. (Docket Entry No. 69 at ¶ 51 and Docket Entry No. 34, Allison Deposition at 66). Allison's understanding was that charges were only misdemeanors and Allison believed that the District Attorneys would not be interested in pursuing such charges. (Docket Entry No. 34, Allison Deposition at 65-66).

Allison alone decided to contact the ICE office in Nashville on whether ICE might be interested in pursuing federal charges. (Docket Entry No. 69 at ¶ 52 and Docket Entry No. 34, Allison Deposition at 86). Although the conduct at issue involved false SSNs, Allison did not contact the Federal Bureau of Investigation. Id. at 90. Allison then met with ICE agents and an Assistant United States Attorney, and after that meeting ICE commenced its investigation based upon Allison's information about Torres and applicants with questionable SSNs. (Docket Entry No. 67-1 at ¶ 15).

Allison supplied ICE agents with the class rosters of all Torres' classes for the previous 12 months. Id. at ¶ 17. Although TABC had a comparative compilation of TABC's servers' SSNs, ICE requested names and conducted a separate analysis. (Docket Entry No. 34, Allison Deposition at 100, 110, 114). ICE then chose servers to interview and Allison accompanied ICE agents to the restaurants, established contact with the servers whom ICE agents then questioned. (Docket Entry No. 67-1 at ¶ 18). Although ICE agents had the addresses of the servers and affected restaurants, Allison explained the reason for his accompanying ICE agents to the server interviews:

7

Q. All right. So why couldn't the ICE agents have done that without you?

A. There was a general consensus that ICE goes in, more than likely no

information was going to be coming to the agents.

(Docket Entry No. 34, Allison Deposition at 141-42). These interviews occurred on September 2-11, 2008, September 25, 2008, and October 27, 2008 and yielded several witnesses who confirmed that Torres had been helping her students to falsify SSNs. (Docket Entry No. 69 at ¶ 44). At the final restaurant visit on October 27, 2008, ICE agents arrested Torres for immigration violations, but she was not charged with falsifying documents. Id. at ¶ 43.

During this time, Allison took a number of photographs of persons, vehicles and restaurants that he explains were to assist ICE agents. (Docket Entry Nos. 36 and 37). Allison also used the terms "illegal" and "illegals" to describe servers because he suspected those persons whom ICE agents wanted to interview were here illegally, but acknowledged his lack of training on immigration. (Docket Entry No. 34, Allison Deposition at 9-11, 18-19, 130-131). According to Allison, during his regular inspections, he would ask for an I-9, an immigration document, if a server's permit were unavailable. Id. at 151.

Yet, on successive days over a three days period in 2007, two witnesses, Angel Padilla, a restaurant manager, and Cecilia Camarena, a restaurant employee, testified about Allison's questioning of the immigration status of Hispanic employees who were not permit holders. According to Padilla, on three successive days in 2007, Allison came to his restaurant and requested all of the waiters' documents, including their I-9 forms, an immigration document. (Docket Entry No. 11-2 at 47). The next day, Allison appeared with another person and reviewed all of his workers' I-9 papers, and Padilla overheard Allison stating "they are not going to show anything." Id. On the next (third) day, Allison appeared casually dressed in shorts and

8

asked for the restaurant employees' alien cards. Allison told Padilla that he would report to ICE any employee who did not have an alien card. Id. Allison also asked about a bus boy at the restaurant and despite Padilla's confirmation of his job position, Allison told Padilla that he would report the bus boy to ICE. Id. According to Padilla, Allison was "very threatening." Id. Padilla states that all of his employees at his restaurant completed their I-9 forms and that he had never received a "no match" letter from the Department of Human Services for any of his employees' SSNs. Camarena, a worker at the restaurant, confirms Allison's demand for alien cards and his statements about the bus boy. Id. at 44.

At this time, in 2007, Allison had not yet contacted ICE officials and was not cooperating with them. Thus, Allison's demands for federal immigration documents are far beyond his authority as a TABC agent and on subjects for which he lacks any training.

### 4. Plaintiff's Server Application

In August 2008, Plaintiff applied for a server's permit from the TABC. (Docket Entry No. 69 at ¶ 2). Plaintiff filed her permit application and "entered" her Taxpayer Identification Number "W7," in the blank designated for a SSN. (Docket Entry No. 11-2 at 2, 3). This W-7 is actually an Internal Revenue Service form for workers who do not have a social security number. Id. at 6. Plaintiff's application listed Veronica Torres as the instructor of her server training course. (Docket Entry No. 67-1 at ¶ 25). After submitting her application, Plaintiff received a letter from the TABC requesting her to bring her Social Security card into the TABC's office. (Docket Entry No. 69 at ¶ 12). On September 17, 2008, Plaintiff appeared at the TABC office and explained that she did not have a Social Security number, only a W-7 Tax Identification Card. (Docket Entry No. 11-2 at 3). A TABC representative responded that Plaintiff could not receive a server's permit without a Social Security card and Plaintiff left TABC's office. Id.

After Plaintiff left TABC's office, the TABC representative who had spoken with Plaintiff told Allison that Plaintiff's application listed Torres as her trainer. (Docket Entry No. 67-1 at ¶ 25). Allison then left the TABC office and approached Plaintiff on a public street outside of TABC's office, identifying himself as a TABC agent. (Docket Entry No. 67-1 at ¶ 31). When Allison approached Plaintiff, he was unaccompanied by any other agents, id. at ¶ 28, and was not wearing a uniform, badge or other form of TABC identification. Id. at ¶ 29. Allison offered Plaintiff assistance in getting her server permit and promised Plaintiff a server permit if she returned to TABC's office. Id. Plaintiff insists that she would not have remained in the TABC's office for thirty minutes without Allison's promise of a permit. (Docket Entry No. 11-2 at 3-4).

Allison admits he lied about the server's permit to convince Plaintiff to remain at the office long enough for ICE agents to arrive. (Docket Entry No. 67-1 at ¶ 32). ICE agents did not request that Allison approach Plaintiff. (Docket Entry No. 69 at ¶ 15). Allison stated his understanding was the ICE was interested in any one who had ties to Torres. (Docket Entry No. 34, Allison Deposition at 109-111).

When Plaintiff returned to the TABC office, Allison asked her to wait in the TABC lobby area. (Docket Entry No. 67-1 at ¶ 34). Neither Allison nor any other TABC agent or employee told the Plaintiff that she could not leave or that she was under arrest. Id. at ¶¶ 30, 33, 39, 40, 41, 43. Prior to the ICE agents' arrival, neither Allison nor any other TABC agent or state law enforcement agent remained in the TABC lobby with Plaintiff. Id. at ¶¶ 36, 38. Only two TABC secretaries and Plaintiff's husband were present in the lobby. Id. Defendants acknowledge that the Plaintiff had not violated any TABC rule nor broken any law related to the TABC. (Docket Entry No. 69 at ¶ 20).

10

Once Plaintiff was in the TABC lobby, Allison called ICE agents from his office on whether ICE agents would question Plaintiff, given that Plaintiff had listed Torres as her trainer. (Docket Entry No. 67-1 at ¶ 36). Approximately 30 minutes after her return to the TABC lobby, ICE agents Jonathan Hendrix and Stephen McCormick approached Plaintiff to question her. (Docket Entry No. 69 at ¶ 17; Docket Entry No. 59, Hendrix Deposition at 123-126). After initial questioning, Allison led Plaintiff and ICE agents to his office for further questioning. (Docket Entry No. 69 at ¶ 17). Allison was absent during ICE agents' questioning in the TABC lobby and in Allison's office. (Docket Entry No. 51, Dionicio Deposition at 25; Docket Entry No. 34, Allison Deposition at 169-171). After questioning Plaintiff about Veronica Torres, the ICE agents questioned Plaintiff about her immigration status and after her responses to these questions, the ICE agents placed Plaintiff under arrest for immigration violations and took her to ICE offices. (Docket Entry No. 51, Dionicio Deposition at 25; Docket Entry No. 59, Hendrix Deposition at 126-127). Allison did not accompany the Plaintiff and the ICE agents to ICE offices. (Docket Entry No. 34, Allison Deposition at 175; Docket Entry No. 51, Dionicio Deposition at 25).

As proof of Allison's racial animus, Plaintiff cites Allison's undisputed use of the term "Illegals" in naming his computer file containing portions of his investigation as evidence that Allison's investigation was motivated by animus against Hispanics. (Docket Entry No. 69 at ¶ 58). Plaintiff also cites Allison use of his position to exceed his authority with the TABC to search for undocumented immigrants. Plaintiff cites the testimony of Angel Padilla, manager of a Mexican restaurant, who described Allison as repeatedly visiting his restaurant in a threatening manner, apparently for no other purpose than to check the immigration status of his employees. (Docket Entry No. 11-2, at 46-47). Plaintiff cites Allison's memorandum about a complaint

11

against Mazatlan Restaurant under a Tennessee statute allowing state or local agents to report businesses employing undocumented workers. (Docket Entry No. 67-3, Exhibit G). In his memorandum, Allison also requested identification from a cashier that Plaintiff contends is not a part of a routine permit inspection. Id. From an examination of the spreadsheets related to the investigation, only Mexican restaurants were inspected during the period of Allison's investigation. (Docket Entry No. 67-2, 32). Hispanic surnames were approximately 99% of those permit holders surveyed. Id. None of these summary sheets reflects the actual and questionable SSNs that are, with one exception, redacted. Id. The redaction was at the Clerk of the Court's request, but the social security numbers could have been filed under seal.

## B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

12

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving

party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Liberty Lobby, 477 U.S. at 257). Moreover, the Court of Appeals explained:

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, No. 89-5731 (6th Cir. September 19, 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" (quoting Liberty Lobby, 477 U.S. at 251-52)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

14

More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is "genuine" that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.

* * *

Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."</u>

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . ."

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn there from must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Company</u>, 791 F.2d 43, 46 (6th Cir. 1986) <u>app.</u> 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

15

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) cert. denied 494 U.S. 1091 (1990). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1.    Complex cases are not necessarily inappropriate for summary judgment.

2.    Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.    The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.    This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

16

5.      A court should apply a federal directed verdict standard in ruling on a motion for summary judgment.  The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.      As on federal directed verdict motions, the 'scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.      The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.      The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.      The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.      The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence.  The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.'  Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Although here there are cross motions for summary judgment, that fact does not preclude an award of summary judgment. Beck v. City of Cleveland, 390 F.3d 912, 917 (6th Cir. 2004). In addition, on cross motions for summary judgment, the applicable standards of review still obtain. The Court must "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the non-moving party." Wiley v. United States, 20 F.3d 222, 224 (6th Cir. 1994).

### 1. Plaintiff's Fourth Amendment Claim

For her Fourth Amendment illegal seizure claim, Plaintiff must first be seized within the meaning of the Fourth Amendment, Terry v. Ohio, 392 U.S. 1, 16 (1968), as not every interaction with a law enforcement officer constitutes a seizure under the Fourth Amendment. United States v. Mendenhall, 446 U.S. 544, 551 (1980). A seizure of a person occurs, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen...." Id. at 552. See also United States v. Richardson, 949 F.2d 851, 855 (6th Cir. 1991) and United States v. Knox, 839 F.2d 285, 289 (6th Cir. 1988)) "It is only when an officer restrains and individual's liberty 'by means of physical force or show of authority' that Fourth Amendment protections attach." Bennett v. City of Eastpointe, 410 F.3d 810, 821 (6th Cir. 2005) (quoting Terry, 392 U.S. at 19).

A seizure under a "show of authority" occurs only where "in view of all the circumstances surrounding the incident, a reasonable person would have believed that [s]he was not free to leave." Mendenhall, 446 U.S. at 554. See also California v. Hodari D., 499 U.S. 621, 628 (1991). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, some physical touching of a person of the citizen, or the use of language or tone of voice indicating that

compliance with the officer's request might be compelled." Mendenhall, 466 U.S. at 554. The Sixth Circuit defines a show of authority that rises to a seizure where "agents exercised their authority in a manner that made it apparent … that [the subject] was not free to ignore the officers and proceed on [her] way." United States v. Grant, 920 F.2d 376, 382 (6th Cir. 1990) (internal quotation marks omitted).

As pertinent here, "the Fourth Amendment forbids … stopping or detaining persons for questioning about their citizenship on less than reasonable suspicion that they may be aliens." United States v. Brignoni-Price, 422 U.S. 873, 884 (1975). "There can be no question that a seizure based solely on race or ethnicity can never be reasonable." Farm Labor Organizing Committee v. Ohio State Highway Patrol, 991 F. Supp. 895, 901 (S.D.Ohio 1997) aff'd 308 F.3d 523 (6th Cir. 2002) (citing Brignoni-Price).

Here, although ICE agents actually arrested Plaintiff, the issue is whether Plaintiff was seized by Allison's conduct prior to that arrest. Neither Elks nor Hutchinson had any contact with Plaintiff on the date of the disputed seizure. Allison approached Plaintiff on a public street alone and without a uniform or a badge. Allison did not tell Plaintiff that she must return to the TABC office with him nor that she could not leave the TABC office. Allison did not participate in the ICE agents' questioning of Plaintiff that led to her arrest. Yet, Allison concedes that he deceived Plaintiff to return to the TABC office with his promise of a server's permit.

Government agents' employment of ruses to conduct searches and seizures does not necessarily violate the Fourth Amendment unless the agents' deception is coercive. "As a general proposition, although a ruse or officers' undercover activity does not usually violate individuals' rights, we have noted that '[w]here, for example, the effect of the ruse is to convince the resident that he or she has no choice but to invite the undercover officer in, the ruse may not

pass constitutional muster.'" United States v. Hardin, 539 F.3d 404, 424-25 (6th Cir. 2008) (footnote omitted). In Hardin, the Sixth Circuit held a search unconstitutional because the defendant was tricked into waiving his right not to have his apartment searched without a warrant where his apartment manager, acting with police officers, falsely told the defendant that he (the manager) had to enter the apartment because of a water leak. Id. at 425. In its decision, the Sixth Circuit observed that deception can be employed to effect an arrest.

> We do emphasize that, in many **circumstances (such as undercover activity designed to uncover illegal conspiracies and acts), ruses and deception may be a perfectly valid tactic for law enforcement.** Lewis v. United States, 385 U.S. 206, 210 (1966). Likewise, **several courts have approved the use of deception in the *execution* of an arrest warrant so as to avoid the potential for violence.** See, e.g., United States v. Michaud, 268 F.3d 728, 731, 733 (9th Cir. 2001) (stating that, in case involving officer who "knocked on [the defendant's] door, claimed to be the assistant manager of the hotel and told her that her boyfriend was sick and needed her assistance," the defendant's "objection to the use of trickery to encourage her to open her hotel room door is unavailing, **given the existence of a valid [arrest] warrant").** . . .

Id. at 425 (emphasis added). Prior to the disputed seizure here, Allison was cooperating with ICE agents and Allison, and as in Hardin, could reasonably be deemed to be ICE's agent at the time Allison approached Plaintiff. Id. at 424-25.

Here, there was not any arrest warrant, but there was an investigation of Torres conspiring with her students to submit false SSNs to obtain a TABC alcohol server permit. Plaintiff was a Torres student. By statute, ICE agents can question a person about his or her immigration status without a warrant, 8 U.S.C. 1357(a)(1), but the Fourth Amendment "limit[s] [the] exercise of the authority granted" by immigration laws. Brignoni-Price, 422 U.S. at 884. Given the results of ICE's investigation of Torres and Plaintiff's ties to Torres, ICE agents, including its de facto agent Allison, had reasonable suspicion to detain and to question Plaintiff.

20

The only basis for a show of authority by Allison was his promise of a server's permit, an obvious and false enticement. Under Hardin, Plaintiff must prove Allison's promise and the circumstances of her return to the TABC office were coercive. The Court's research did not identify a factually similar decision, but the Sixth Circuit in Pennington v. Metro. Gov't of Nashville and Davidson County, 511 F.3d 647, 652 (6th Cir. 2008), adopted the Seventh Circuit principle that "the Fourth Amendment does not protect against the threat of job loss." Driebel v. City of Milwaukee, 298 F.3d 622, 642 (7th Cir. 2002). "A person is not seized simply because he will lose his job." Pennington, 511 F.3d at 652. In Pennington, a police officer contended that his involuntary breathalyzer test was an unreasonable seizure. Id. at 650-651. In Driebel, a more factually similar decision, a police officer was ordered by his supervisor to remain at a site for questioning by police supervisors, and the Seventh Circuit held that without proof of coercive circumstances, the officer's remaining at the designated site was not a seizure for Fourth Amendment purposes. Driebel, 298 F.3d at 642-45. Under Driebel, "the relevant constitutional inquiry must focus on whether reasonable people in [Plaintiff's] position would have **feared** seizure or **detention**, if they had refused." Id.

A corollary of the Driebel principle is that promise or an enticement to secure a job by issuance of a permit is also not protected by the Fourth Amendment. Under Pennington and Driebel, Allison's false promise of a permit necessary for a server's job does not implicate the Fourth Amendment. Applying Hardin, the Court concludes that Plaintiff lacks proof that Allison's promise alone and in combination with the atmosphere at the TABC office, was so coercive as to force her to remain there. The Court concludes that despite Allison's deception, Plaintiff was not subject to the requisite coercive environment to be seized for Fourth Amendment purposes by her stay at the TABC office so as to fall under the exception in Hardin.

21

Thus, the Court concludes that Plaintiff's proof cannot support a judgment on her Fourth

Amendment claim.

## 2. Plaintiff's Equal Protection Claim

Here, Plaintiff also asserts that the Defendants selectively applied TABC regulations to

Hispanic permit holders and that Allison's actual motivation was to enforce federal immigration

laws against Plaintiff and other Hispanic immigrants subject to TABC authority. The Equal

Protection Clause of the Fourteenth Amendment provides, in pertinent part, that the State shall

not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const.

Amend. 14 § 1. The Equal Protection Clause prohibits discrimination both in the language of a

law and its application or enforcement, even if a law is otherwise impartial. Yick Wo v.

Hopkins, 118 U.S. 356, 373-74 (1886).

For this claim, a plaintiff need not prove that discriminatory intent was the sole

motivation for a state agent's actions or even a primary motivation. Village of Arlington Heights

v. Metropolitan Housing Development Corp., 429 U.S. 252, 265 (1977). If evidence shows that

racial animus were a motivating factor, then the enforcement decisions in question are not

entitled to deference. Id. at 265-66. This is particularly true where, as under the facts here, the

enforcement of the laws "bears more heavily on one race than another." Id. "The states cannot

make distinctions which either burden a fundamental right, target a suspect class, or intentionally

treat one differently from others similarly situated without any rational basis for the difference."

Radvansky v. City of Olmsted Falls, 395 F.3d 291, 312 (6th Cir. 2005).

In a factually similar setting, the Sixth Circuit described the equal protection right to be

free from selective enforcement by State agents against persons of Hispanic descent.

> [A]s this court has recognized, "[t]he Equal Protection Clause of the Fourteenth
> Amendment provides citizens a degree of protection independent of the Fourth

Amendment protection against unreasonable searches and seizures." United States v. Avery, 137 F.3d 343, 352 (6th Cir.1997). Similarly, the Supreme Court, in Whren v. United States, confirmed that an officer's discriminatory motivations for pursuing a course of action can give rise to an Equal Protection claim, even where there are sufficient objective indicia of suspicion to justify the officer's actions under the Fourth Amendment:

> We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Therefore, if the plaintiffs can show that they were subjected to unequal treatment based upon their race or ethnicity during the course of an otherwise lawful traffic stop, that would be sufficient to demonstrate a violation of the Equal Protection Clause. Cf. United States v. Montero-Camargo, 208 F.3d 1122, 1135 (9th Cir.) (en banc) (holding that equal protection principles precluded use of Hispanic appearance as a relevant factor for Fourth Amendment individualized suspicion requirement), cert. denied, 531 U.S. 889, 121 S.Ct. 211, 148 L.Ed.2d 148 (2000).

Farm Labor Organizing Committee v. Ohio State Highway Patrol, 308 F.3d 523, 533 (2002).

As to the various types of proof for this constitutional claim, the Sixth Circuit stated:

> The Supreme Court has explained that a claimant alleging selective enforcement of facially neutral criminal laws must demonstrate that the challenged law enforcement practice "had a discriminatory effect and that it was motivated by a discriminatory purpose." Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). "To establish discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." United States v. Armstrong, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). A claimant can demonstrate discriminatory effect by naming a similarly situated individual who was not investigated **or through the use of statistical or other evidence which "address[es] the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated."** Chavez v. Ill. State Police, 251 F.3d 612, 638 (7th Cir.2001). **Discriminatory purpose can be shown by demonstrating that the "'decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'"** Wayte, 470 U.S. at 610, 105 S.Ct. 1524 (quoting Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870

(1979)). Determining whether official action was motivated by intentional discrimination "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "**[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another.**" Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

Id. at 533-34 (emphasis added).

The undisputed facts are that for the 2003-04 investigation Elks and Cawthon directed inspection of **all** permit holders at restaurants during renewal inspections. There is not any documentary evidence that Elks and Cawthon's 2003-04 investigation was not implemented consistent with those instructions nor that only Hispanic named restaurants and Hispanic servers were investigated. Although Cawthon's testimony about TABC's lack of authority to revoke permits is questionable in light of express Tennessee law,[2] the Court concludes that there is not any proof that these Defendants' 2003-04 investigation was a pretext for immigration enforcement, motivated by racial animus or tied to the Plaintiff.

Plaintiff's proof of Allison's racial motivation in his 2007-2008 investigation of Plaintiff is twofold: Allison's treatment of her and other Hispanics and Allison's use of TABC's licensing process to engage in selective enforcement against Hispanics and as a pretext for immigration enforcement, a subject beyond Allison's regulatory authority. As to Plaintiff's individual treatment, Plaintiff contends Allison's decision to question her after Plaintiff left the TABC office was only because she is Hispanic. According to Allison, he only pursued Plaintiff

---

[2] See Tenn. Code Ann. § 57-4-202(a) that provides:

> "The commission shall have authority to revoke or suspend any permit granted herein for the violations of the provisions of any applicable provision of this chapter, and any person aggrieved by the action of this commission in revoking or suspending a permit, or in refusing to grant a permit, may have such action reviewed as provided by the Uniform Administrative Procedures Act, compiled in title 4, chapter 5."

24

because a TABC employee informed him that Plaintiff listed Torres as her trainer, Plaintiff had just been in TABC's office, and ICE agents were interested in persons with ties to Torres. To be sure, Plaintiff did not provide a SSN, but it is undisputed that Torres completed Plaintiff's permit application. Yet, these facts must be considered in combination with Plaintiff's other proof.[3]

As to Defendants' 2007-2008 enforcement of its SSN requirement as a pretext, Plaintiff cites TABC's failure to pursue state criminal charges against Torres, and for a time, allowing her to continue as a TABC trainer. Plaintiff construes this non-action as demonstrating that the false SSNs were not the true subject of TABC's investigation. Contrary to Cawthon's explanation,

---

[3] Plaintiff specifically cites the lack of any TABC statute or regulations requiring a Social Security number for a server's permit and contends that the Privacy Act of 1974 requires such authority, citing 5 U.S.C. § 552a.

> (a)(1) It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.
> (2) the [The] provisions of paragraph (1) of this subsection shall not apply with respect to-
>
> (A) any disclosure which is required by Federal statute, or
> (B) the disclosure of a social security number to any Federal, State, or local agency maintaining a system of records in existence and operating before January 1, 1975, if such disclosure was required under statute or regulation adopted prior to such date to verify the identity of an individual.
>
> **(b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it.**

5 U.S.C. § 552 a(g) (emphasis added). Yet, in Schmitt v. City of Detroit, 395 F.3d 327, 329-31 (6th Cir. 2005), the Sixth Circuit held this statute inapplicable to local and state governments. Prior to Schmitt, a district court allowed such a claim against a city. Id. at 329. Additionally, in McKay v. Thompson, 226 F.3d 753, 755 (6th Cir. 2000), the Sixth Circuit actually considered a Privacy Act claim challenging disclosure of SSNs for voter eligibility under Tennessee law, and decided the merits of the claim, concluding that disclosure was consistent with the Privacy Act because "Tennessee enacted its statute requiring social security numbers for voter registration in 1972."

state law expressly authorizes the TABC to revoke any permit or license issued by TABC, including a server's permit.[4]  Plaintiff also cites the lack of TABC records showing that non-Hispanic servers' SSNs were checked in the 2007-2008.  The documentary evidence of Allison's investigation shows that virtually all of the allegedly questionable SSNs were secured for Hispanic servers.  (Docket Entry No. 67, Exhibit 1 at 16-23, Response Nos. 6, 8).  To be sure, disproportionate impact on a certain group is not alone proof of discrimination, Arlington Heights, 429 U.S. at 264-65, but the documentary evidence that Allison's investigation focused virtually entirely on Hispanic restaurants and workers can establish discriminatory purpose and effect.  Farm Labor Organizing Committee, 308 F.3d at 540.

The applicable Tennessee statutes list specific conditions for alcohol server permits, but citizenship is not listed.  Tenn. Code Ann. §§ 57-3-703(1)-(6) and 57-3-704(1)-(6).  The statute also lists certain subjects for an application, but does not require disclosure of a social security number.  Id.  To be sure, the statute authorizes TABC to determine the application form.  Tenn. Code Ann. § 57-3-703.  At least prior to the 2004 decision in the Sixth Circuit, Section 552a(g) actually required state agencies to be authorized by law to require a person's social security number.  In any event, TABC's purpose for requiring SSNs as necessary to establish identity is disputed, given that the United States does not consider a SSN to prove the identity of a person.

Plaintiff's proof also includes the testimony of Angel Padilla, a restaurant manager, who described Allison's "very threatening" harassment of Hispanic restaurant workers and employees who are not TABC permit holders, but whom Allison suspects are undocumented aliens.  Allison demanded examination of all employee records, including alien cards and the I-9 immigration documents.  Allison threatened to report a bus boy to ICE without any apparent factual basis.  Allison's successive visits over three consecutive days to Padilla's restaurant were inconsistent

_____

[4] See n. 2, supra.

with the investigation's use of monthly inspections. (Docket Entry No. 67-1 at ¶ 6; Docket Entry No. 34, Allison Deposition at 125-126). At the time of his visits at Padilla's restaurants in 2007, Allison was not acting in cooperation with ICE agents and was inquiring on subjects for which Allison admittedly lacked training. In using the Westlaw system to verify SSNs, Allison was violating TABC's agreement with Westlaw. Allison also used the terms "Illegal" and "Illegals" to label persons in pictures he took during his investigation. Allison admits his lack of his training to justify that assertion or to make such a determination, but states he was doing so based upon ICE's list of names.

Considering all of the parties' proof, the Court concludes that a genuine issue of material fact exists as to whether Allison's acts were motivated, in part, by an animus against Hispanics, and therefore, summary judgment as to Defendant Allison is inappropriate.

### 3. Plaintiff's Failure to Supervise or Train

Plaintiff contends Defendants Elks and Hutchens failed to train Allison and such failure caused Allison's violations of Plaintiff's federal rights. Defendants contend that a claim of failure to train or supervise under 42 U.S.C. § 1983 must establish "deliberate indifference" meaning that the supervisor was "on notice" regarding "a history of similar events" likely to lead to injury, citing and quoting Slusher v. Carson, 540 F.3d 449, 457 (6th Cir. 2008). Slusher, however, was an action was against a county and its officials.

In Walker v. Norris, 917 F.2d 1449, 1455-56 n.10 (6th Cir. 1990) the Sixth Circuit applied the deliberate indifference standard to a failure to train claim against state officials. There, the Sixth Circuit explained that for supervisory liability, the fact "that a particular officer may be unsatisfactorily trained will not alone suffice" nor would proof of "a faulty training program." Id. at 1455-56 (quoting City of Canton Ohio v. Harris, 489 U.S. 378 (1989)); Monell

v. Dep't of Soc. Serv. of City of New York, 436 U.S. 658, 694-695 (1978). Plaintiff must also

show the supervisors' actual acquiescence in Allison's conduct. Hicks v. Frey, 992 F.2d 1450,

1455 (6th Cir. 1993). Here, Plaintiff fails to present evidence of Elks's or Hutchens's actual

knowledge of the details of Allison's 2007 investigation or proof of any deliberate indifference

of TABC's overall training program. Elks testified that ICE officials gave some training to

TABC agents in 2007. Allison alone decided to contact ICE agents. Thus, the Defendants'

motion for summary judgment on Plaintiff's failure to train and supervise claim should be

granted.

### 4. Plaintiff's Section 1357 Claim

Plaintiff's claim is that TABC lacked a written agreement authorizing TABC to enforce

immigration laws under 8 U.S.C. § 1357(g)(1) and absent an agreement, any cooperation with

ICE violated these statutes. The power to regulate federal immigration law rests with the federal

government. DeCanas v. Bica, 424 U.S. 351 (1976). Absent a delegation of that power by the

Attorney General, local and state officials lack the power to enforce civil immigration law. 8

U.S.C. § 1103(a)(10); 8 U.S.C. § 1357(g). Yet, Section 1357(g)(10) provides that state agencies

may "cooperate with the Attorney General in the identification, apprehension, detention, or

removal" of illegal aliens without a written agreement. The Tenth Circuit viewed these statutes

as a whole and stated:

> This collection of statutory provisions evinces a clear invitation from Congress
> for state and local agencies to participate in the process of enforcing federal
> immigration laws. Viewed against this backdrop, [defendant's] claim that
> allowing state and local officers to arrest illegal aliens pursuant to preexisting
> state or local authority would impede the accomplishment of Congress' purposes
> and objectives in enacting § 1252c is particularly unconvincing.

United States v. Vasquez-Alvarez, 176 F.3d 1294, 1300 (10th Cir. 1999); see also Arias v.

United States Immigration and Customs Enforcement Div. of Dept. of Homeland Sec., 2008 WL

28

1827604, at *13-14 (D. Minn. 2008); <u>United States v. Arizona</u>, 2010 WL 2926157, at *3, *11

(D. Ariz. 2010) (describing legal ongoing cooperative efforts regarding undocumented aliens

between the United States and local officials). The undisputed fact is that in 2007 the

Defendants were acting in cooperation with ICE agents and with the knowledge of an Assistant

United States Attorney. Therefore, Defendants' motion for summary judgment on this claim

should be granted.

### 5. Plaintiff's Conspiracy Claim

Forty-Two U.S.C. § 1985 allows an action against any two or more people who conspire

to deny the civil rights of another. To state a claim under 42 U.S.C. § 1985, Plaintiff must

allege:

> "(1) a conspiracy; (2) for the purposes of depriving ... any person or class of
> persons of equal protection of the laws ... (3) an act in furtherance of the
> conspiracy; (4) whereby a person is either injured in his person or property or
> deprived of any right or privilege of a citizen of the United States."

<u>Vakilian v. Shaw</u>, 335 F.3d 509, 518 (6th Cir. 2003) (quoting <u>United Bhd. Of Carpenters &</u>

<u>Jointers Local 610 v. Scott</u>, 463 U.S. 825, 828-29 (1983)). Conspiracies must be pled with

factual specificity. <u>Dallas v. Holmes</u>, 137 Fed. Appx. 746, 752 (6th Cir. 2005).

Plaintiff alleges that Defendants Elks, Hutchens and Allison conspired to deprive her of

her constitutional rights. However, Plaintiff has failed to provide specific facts of a conspiracy

between any of the three defendants to discriminate against the Plaintiff or any other Hispanic

applicants in Allison's methods in the 2007 investigation. Allison alone made the decision to

contact ICE and led the 2007 investigation. Thus, the Court concludes that Defendants' motion

for summary judgment as to the conspiracy claim should be granted.

29

### 6. Plaintiff's Claim Under Privacy Act of 1974

As to this claim, under <u>Schmitt</u>, the civil remedies established by 5 U.S.C. § 552a(g) for violations of the Privacy Act of 1974 extend only to violations by federal agencies. 395 F.3d at 329-31. Thus, summary judgment for the Defendants should be granted as a matter of law on this claim.

For the reasons stated above, the Court concludes that the Plaintiff's motion for summary judgment (Docket Entry No. 32) should be denied. The Court also concludes that the Defendants' motion for summary judgment (Docket Entry No. 31) should be granted as to Defendants Elks and Hutchens and on all of Plaintiff's claims except for Plaintiff's equal protection claim against Defendant Allison.

An appropriate order is filed herewith.

**ENTERED** this the 30ᵗʰ day of September, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge